**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**January 6, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 20-6125 |
| TOMMY DEAN BULLCOMING, | |
| Defendant - Appellant. | |

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:18-CR-00086-G-1)**
_____

Howard A. Pincus, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant – Appellant.

Steven W. Creager, Assistant United States Attorney (Mark R. Stoneman, Assistant United States Attorney, and Robert J. Troester, Acting United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff – Appellee.
_____

Before **McHUGH**, **MURPHY**, and **CARSON**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Linda Zotigh of Hammon, Oklahoma was murdered and her trailer, in which her boyfriend Tommy Dean Bullcoming also periodically resided, was set on fire. The day after law enforcement found Ms. Zotigh's body, they arrested

Mr. Bullcoming pursuant to a warrant for failure to appear in court on an earlier marijuana possession charge. At the time of his arrest, Mr. Bullcoming had a black duffel bag in his possession, and he asked law enforcement to bring the bag with them during his transport to the courthouse. Law enforcement searched the bag on three separate occasions and used information from these searches in the affidavit filed in support of the search warrant.

Following issuance of a search warrant, law enforcement found a pair of sandals spotted with blood inside the bag. Authorities later matched the blood to Ms. Zotigh. Prior to his trial, Mr. Bullcoming moved both for an order to access Ms. Zotigh's trailer and to suppress evidence from the duffel bag. The district court denied both motions. A jury ultimately convicted Mr. Bullcoming of felony murder, kidnapping, carjacking, and arson. On appeal, Mr. Bullcoming challenges the denial of both of his motions. For the following reasons, we affirm the district court's denial of Mr. Bullcoming's motions and affirm his convictions.

## I. BACKGROUND

### A. *Factual History*

Ms. Zotigh and Mr. Bullcoming—both members of federally recognized Indian tribes—had an on-again-off-again romantic relationship for approximately two years, beginning in 2015 and ending with her death. They broke up frequently, most often fighting about Mr. Bullcoming's drinking and drug use. When they were together, Mr. Bullcoming lived at Ms. Zotigh's trailer located on Indian trust land in Hammon,

Oklahoma. However, Ms. Zotigh did not permit Mr. Bullcoming to stay in the trailer when she was traveling.

In June 2017, Mr. Bullcoming and Ms. Zotigh were arrested following the discovery of marijuana in Ms. Zotigh's vehicle. Consequently, they were both scheduled to appear in tribal court in Concho, Oklahoma on September 7, 2017 at 10:30 a.m.

On August 31, 2017, Ms. Zotigh traveled to Arizona with her adult son, Timothy Raya, to attend a tribal intramural basketball tournament. Because she would be away for the weekend, she asked her cousins, Wendell and Chris Johnson, if Mr. Bullcoming could stay with them at their nearby house instead of in her trailer. The Johnsons agreed, and Mr. Bullcoming arrived with a trash bag of clothes and his wallet to spend the weekend at their home. During the course of her trip, Ms. Zotigh broke up with Mr. Bullcoming. After she returned from Arizona, she asked Wendell Johnson to tell Mr. Bullcoming "to come get his belongings" because "she didn't want him there no [sic] more." ROA Vol. 4 at 396–97.

On September 6, 2017, shortly before midnight, volunteer firefighter Colin Candy noticed Ms. Zotigh's trailer on fire. Mr. Candy returned home, woke his wife, and told her to call dispatch to report the fire, which she did at 11:53 p.m. Mr. Candy then met firefighter Timothy Williams at the fire station and drove the fire truck to Ms. Zotigh's trailer. After they extinguished the fire, the men entered the trailer and saw what appeared to be blood on the walls and subfloor of the hallway.

At around 2:00 a.m. on September 7, Special Agent Micah Ware of the Bureau of Indian Affairs ("BIA") received a call advising him of the fire at Ms. Zotigh's trailer.

3

When Agent Ware arrived at the scene, he conducted a brief search of the trailer to confirm Ms. Zotigh was not inside. He took photographs and swabs of blood splatter in the kitchen area. He also observed blood in Ms. Zotigh's car and took swabs from the driver's seat and middle portion of the car. At 3:30 p.m., Agent Ware released the trailer to Ms. Zotigh's family.

At approximately 6:00 p.m. that same day, Agent Ware discovered Ms. Zotigh's body in a field of tall grass several yards off a dirt road. Her mouth was covered in duct tape as was one of her wrists. She had close to seventy knife wounds and one had severed her jugular vein.

On the evening of September 6, prior to Ms. Zotigh's murder, Mr. Bullcoming was at the Johnsons' house about two-hundred feet from Ms. Zotigh's trailer. At some point, Mr. Bullcoming left without being seen by either of the Johnson brothers. Mr. Bullcoming was not around when the Johnsons discovered the fire at Ms. Zotigh's trailer, and he never came back to their house.

At around 11:45 p.m. that night, Mr. Bullcoming arrived at the home of his aunt, Mary Miles, and her daughter, Jamie Highwalker. He asked Ms. Highwalker for a ride to Concho in time for his court date the next morning. Because Ms. Highwalker could not take him to Concho, she took Mr. Bullcoming to Elk City where they stopped at Hutch's Convenience Store so Mr. Bullcoming could buy beer before heading to the home of their cousin, John Standingwater. Surveillance footage from Hutch's Convenience Store showed "what appeared to be blood on [Mr. Bullcoming's] right palm and left ring finger area." ROA Vol. 3 at 20–21. Mr. Bullcoming spent the night at Mr. Standingwater's

4

home. At Mr. Standingwater's home, Mr. Bullcoming picked up a black duffel bag he had left there following a previous visit.

From there, Mr. Bullcoming continued to try and make his way to Concho. The evening of September 7, Mr. Bullcoming and his cousin, Seger Williams, arrived at Robert Buckman's house in El Reno and asked if they could spend the night. Mr. Buckman agreed to let them sleep in his living room. Agent Ware and other officers tracked Mr. Bullcoming to Mr. Buckman's home, arriving at around 3:00 a.m. on September 8. Because he missed his September 7 court date, the officers arrested Mr. Bullcoming on a warrant for failure to appear in tribal court.

Mr. Bullcoming asked the officers to bring his black duffel bag with them. Later, Mr. Bullcoming asked Agent Ware to retrieve his medication from one of the pockets of the duffel bag. When Agent Ware did not immediately find the medication, he emptied the contents of the bag onto the floor. He observed numerous items including clothing and shoes but did not find the medication. Agent Ware then put the items back into the bag, shut it, and put the bag in the back of his vehicle. The bag remained undisturbed in Agent Ware's truck throughout the weekend.

Three days later, on Monday, September 11, Agent Ware logged the duffel bag into an evidence "pod" where it remained. ROA Vol. 4 at 931. Agent Ware acknowledged that under BIA procedures he should have logged the bag at the end of his shift, on September 8. At that time, however, he had been awake for over twenty-four hours and thought the circumstances warranted an exception. After logging the bag on September 11, Agent Ware then inventoried and took photographs of its contents. During

5

that search, Agent Ware found Mr. Bullcoming's medication but did not deliver it to him.

On September 18, an Assistant United States Attorney indicated the prosecution would

seek a search warrant for the bag, prompting Agent Ware to conduct a second and more

thorough inventory search of the duffel bag and to create a list of the items inside. During

this search, he observed what he thought was possible blood on a pair of sandals.

On November 1, 2017, a federal magistrate judge issued a search warrant for

Mr. Bullcoming's bag. Agent Ware's affidavit in support of the application provided a

detailed list of the contents of the bag as well as a statement that "[d]uring a more

thorough inventory of [Mr. Bullcoming's] black bag on September 18" he discovered

"what appeared to be possible red/bloody spots on a pair of gray size 13 Jordan slippers."

ROA Vol. 3 at 20–21. The Oklahoma State Bureau of Investigations later determined the

blood on the sandals was Ms. Zotigh's. In addition, the affidavit described

Mr. Bullcoming's and Ms. Zotigh's recent breakup and the bloody nature of the crime.

Specifically, the affidavit described: (1) "fresh blood" found in Ms. Zotigh's vehicle and

"within the residence," (2) a bloody tissue box discovered near Ms. Zotigh's body, and

(3) "multiple apparent stab wounds" on Ms. Zotigh's body. ROA Vol. 3 at 17, 19. The

affidavit also described blood on Mr. Bullcoming's person and clothes including:

(1) "what appeared to be several cuts and/or scrapes on [Mr. Bullcoming's] arms, hands,

and legs"; (2) a description of blood observed on Mr. Bullcoming's belt; and (3) from

surveillance footage, "what appeared to be blood on [Mr. Bullcoming's] right palm and

left ring finger area," at Hutch's convenience store. *Id.* at 20–21. Finally the affidavit

provided additional circumstantial evidence tying Mr. Bullcoming to the murder

including: (1) a statement from Wendell and Chris Johnson that Mr. Bullcoming had left

their home that evening and had not returned, (2) a statement from Ms. Zotigh's daughter

that her mother and Mr. Bullcoming often visited the location where Ms. Zotigh's body

was found, and (3) a statement from a witness that she may have observed

Mr. Bullcoming driving Ms. Zotigh's car at a "high rate of speed" the evening of the

murder. *Id.* at 17–22.

### B.  Procedural History

A federal grand jury in the United States District Court for the Western District of

Oklahoma indicted Mr. Bullcoming on charges of first-degree premeditated murder,

first-degree felony murder, carjacking resulting in death, kidnapping resulting in death,

and arson. Mr. Bullcoming pleaded not guilty.

Prior to trial, Mr. Bullcoming filed a motion for an order permitting access to

Ms. Zotigh's trailer. Mr. Bullcoming argued defense counsel would be able to obtain

forensic evidence and important ceremonial items that he claimed to have left in the

trailer, which would support Mr. Bullcoming's argument that he would not have

incinerated the trailer with his ceremonial items inside. Mr. Bullcoming cited his Sixth

Amendment right to effective assistance of counsel in support of his motion. The district

court found it did not have authority "to order entry and inspection of property that is not

within the government's possession, custody, or control," and denied Mr. Bullcoming's

motion for access to the trailer. ROA Vol. 1 at 211.

Mr. Bullcoming also moved to suppress the evidence from his duffel bag,

specifically, the sandals flecked with Ms. Zotigh's blood. According to Mr. Bullcoming,

the information about the bag's contents provided by Agent Ware in the affidavit for the search warrant was unconstitutionally obtained and therefore tainted the warrant, making the search illegal. The district court held that "the affidavit contains enough evidence to support probable cause to search Defendant's black bag and its contents, even after excising all information concerning the contents for the reason that it may have been derived from an illegal search." *Id.* at 533. The district court found that while the description of the blood on the sandals "certainly bolster[ed] the finding of probable cause" the evidence was not necessary to establish probable cause in light of the other evidence presented in the affidavit including: (1) the blood on Mr. Bullcoming's hand shown in the surveillance video, (2) the scrapes and cuts on Mr. Bullcoming's body at the time of his arrest, (3) the blood on Mr. Bullcoming's belt, and (4) the fact Mr. Bullcoming had the black duffel bag with him when arrested and requested that law enforcement bring it with them. *Id.* The district court also held the evidence was admissible because authorities would have inevitably discovered it even if Agent Ware's inventory searches were unconstitutional. The district court therefore denied the motion to suppress.

A jury ultimately found Mr. Bullcoming guilty of first-degree felony murder, carjacking resulting in death, kidnapping resulting in death, and arson. Following his sentencing, Mr. Bullcoming filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Mr. Bullcoming challenges the district court's denial of both his motion to access Ms. Zotigh's trailer and his motion to suppress evidence obtained

8

from his duffel bag. We address each motion in turn and affirm the district court's denial of both motions.

### A. Motion to Access Trailer

We first turn to Mr. Bullcoming's challenge regarding his motion to access Ms. Zotigh's trailer. Mr. Bullcoming argued to the district court that access to the trailer would allow him to examine forensic evidence and find emotionally significant ceremonial items in support of his defense that he would not have intentionally burned down the trailer. At the time Mr. Bullcoming filed his motion, a third party, not the Government, possessed Ms. Zotigh's trailer. The district court ultimately held it did not have authority "to order entry and inspection of property that is not within the government's possession, custody, or control," and denied Mr. Bullcoming's motion for an order to access the trailer. *Id.* at 208–14.

On appeal, Mr. Bullcoming does not address whether the district court had authority to order the requested access. Instead, he argues "the district court intruded on [his] due-process right to a fair trial, as well as the ability of his attorneys to provide the effective representation required by the Sixth Amendment, by denying him access to the trailer." Aplt. Br. at 61. We review the district court's denial of Mr. Bullcoming's motion de novo. *United States v. W.R. Grace*, 526 F.3d 499, 505 (9th Cir. 2008) ("a district court's rulings on the scope of its authority to order discovery under Federal Rule of Criminal Procedure 16" are reviewed de novo). Because we agree with the district court that it lacked authority to grant the requested access, we affirm the district court's denial of Mr. Bullcoming's motion.

There is "no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). However, under Federal Rule of Criminal Procedure 16, a district court may regulate discovery and may "for good cause . . . grant other appropriate relief." Fed. R. Crim. P. 16(d)(1). Before the district court, Mr. Bullcoming argued this language gave the court authority to grant him access to Ms. Zotigh's trailer. We agree with the district court that it did not.

Mr. Bullcoming has pointed us to no support for the proposition that a federal court has authority to order access to the property of a third party for purposes of discovery in a criminal case. While no federal appellate courts appear to have addressed this issue, the federal district courts that have considered it have declined to grant such authority. *See, e.g.*, *United States v. Hawk*, No. CR 12-50044-JLV, 2013 WL 773908, at *2 n.1 (D.S.D. Feb. 28, 2013) (unpublished) ("The defendant has not presented any case law, nor is this court aware of any case law within the Eighth Circuit, which supports an absolute constitutional right to enter a private residence not in control of the government in order to view the scene of the charged offense."); *United States v. Bryant*, No. 8:08CR377, 2009 WL 3229756, at *1–2 (D. Neb. Oct. 5, 2009) (unpublished) (denying the defendant's motion for leave to inspect the premises of a nonparty). Although Mr. Bullcoming is correct that there are some states that appear to allow for this kind of discovery,[1] *see, e.g.*, *State v. Tetu*, 386 P.3d 844, 857 (Hawaii 2016) and

---

[1] While some states do permit criminal defendants to access third-party property under state constitutions, others do not. *See, e.g.*, *People In Interest of E.G.*, 368 P.3d 946, 954 (Colo. 2016) (holding "neither the United States Constitution, the Colorado Rules of Criminal Procedure, nor any statute provides the trial court with

*Henshaw v. Commonwealth*, 451 S.Ed.3d 415, 419 (Va. App. 1994), these cases rely upon state constitutions with broader discovery rights for defendants, not the United States Constitution. In addition, it is recognized that Rule 16 does not require the Government to "take action to discover information which it does not possess," *United States v. Tierney*, 947 F.2d 854, 864 (8th Cir. 1991), nor is the Government required to secure information from third parties. *United States v. Gatto*, 763 F.2d 1040, 1048 (9th Cir. 1985).

On appeal, Mr. Bullcoming argues his "due-process right to a fair trial and his Sixth Amendment right to the effective assistance of counsel" were infringed because he was not permitted access to the trailer. Aplt. Br. at 59. However, in support of this argument, Mr. Bullcoming points only to the same inapplicable state cases as discussed *supra*. And we find no support under the United States Constitution or federal statutes to support Mr. Bullcoming's arguments. Indeed, allowing such discovery would collide with a panoply of federal constitutional rights held by the third-party owner of the property.[2]

---

the authority to grant access to [a] private home without . . .consent"); *State v. Lee*, 929 N.W.2d 432, 440 (Minn. 2019) (holding that Minnesota discovery rules "do[] not require the State to allow a defendant to inspect a crime scene that is in control of a third party").

[2] Even if Mr. Bullcoming had obtained access to the trailer, it is unlikely it would have advanced the defense. The trailer had been left open to the elements and trespassers for many months after the murder. To the extent any forensic evidence remained, it would be compromised and there was no way to assure that anything that might be found in the trailer was there at the time of the crime.

Because the district court lacked the authority to grant Mr. Bullcoming access to Ms. Zotigh's trailer and because Mr. Bullcoming failed to substantiate his constitutional claims, we affirm the district court's denial of Mr. Bullcoming's motion.

### B. Motion to Suppress

We next turn to the district court's denial of Mr. Bullcoming's motion to suppress. Because the district court denied Mr. Bullcoming's motion to suppress, "we accept the district court's findings of fact unless they are clearly erroneous." *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003). However, "[t]he ultimate determination of reasonableness under the Fourth Amendment is a conclusion of law that we review *de novo*." *Id.*

On appeal, Mr. Bullcoming challenges two of the three searches undertaken by Agent Ware—the first on Monday, September 11, and the second on Monday, September 18. Mr. Bullcoming argues these searches were illegal, and therefore the affidavit Agent Ware submitted in support of the application for a search warrant—which contained information obtained from these searches—tainted the warrant and the ultimate search of the bag. He argues the district court should therefore have suppressed the evidence collected from his duffel bag, specifically, the forensic blood evidence from the sandals.

Ultimately, the district court did not decide whether either of Agent Ware's searches were reasonable. Instead, the district court excised the description of the bloody sandals from the affidavit and concluded, "the affidavit contains enough evidence to support probable cause to search Defendant's black bag and its contents,

even after excising all information concerning the contents for the reason that it may have been derived from an illegal search." ROA Vol. 1 at 533. The district court therefore denied Mr. Bullcoming's motion to suppress.

We agree with the district court that it is immaterial whether Agent Ware's searches on September 11 and September 18 were illegal; the affidavit in support of the search warrant contained enough information to establish probable cause even without the information obtained from those searches. "When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information." *United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005). Said in another way, "[a]n affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *Id.* (quotation marks omitted).

Probable cause is a "flexible, common-sense standard," and we therefore "must interpret the Government's affidavit in a flexible, common-sense way." *United States v. Biglow*, 562 F.3d 1272, 1282 (10th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Barajas*, 710 F.3d 1102, 1108 (10th Cir. 2013) (quotation marks omitted). We review de novo the question of whether there was probable cause presented by the affidavit even without the information

from the challenged searches. *United States v. Loera*, 923 F.3d 907, 914–15 (10th Cir. 2019). Excising the information included from the challenged searches, we conclude the affidavit established probable cause to support the search warrant for Mr. Bullcoming's bag.

The affidavit described Mr. Bullcoming's and Ms. Zotigh's fraught relationship, recent breakup, and the nature of the crime—including the amount of blood found in Ms. Zotigh's car and trailer. Specifically, the affidavit detailed the "fresh blood" found in Ms. Zotigh's vehicle and "within the residence," a bloody tissue box discovered near Ms. Zotigh's body, and Ms. Zotigh's body which had suffered "multiple apparent stab wounds." ROA Vol. 3 at 17, 19. Importantly, the affidavit also described "what appeared to be several cuts and/or scrapes on [Mr. Bullcoming's] arms, hands, and legs," blood observed on Mr. Bullcoming's belt, and from surveillance footage, "what appeared to be blood on [Mr. Bullcoming's] right palm and left ring finger area." *Id.* at 20–21. The affidavit provided additional circumstantial evidence tying Mr. Bullcoming to the murder including: (1) a statement from Wendell and Chris Johnson that Mr. Bullcoming had left their home that evening and had not returned, (2) a statement from Ms. Zotigh's daughter that her mother and Mr. Bullcoming often went to the location where Ms. Zotigh's body was found, and (3) a statement from a witness that she may have observed Mr. Bullcoming driving Ms. Zotigh's car at a "high rate of speed"—she estimated she was 20% to 30% sure. *Id.* at 17–22. None of this information was obtained from the challenged searches.

The only information obtained as the result of Agent Ware's challenged searches in the affidavit was its description of the general contents of the duffel bag. Most significantly, the affidavit states "[d]uring a more thorough inventory of [Mr. Bullcoming's] black bag on September 18, 2017, your affiant observed what appeared to be possible red/bloody spots on a pair of gray size 13 Jordan slippers." *Id.* at 20. We agree with the district court, however, that the information provided in the affidavit, without reference to the possible blood on the Jordan slippers, is sufficient to establish probable cause that evidence of Ms. Zotigh's murder would likely be found in Mr. Bullcoming's duffel bag.

Because the murder involved numerous stab wounds and a great deal of blood, and Mr. Bullcoming had cuts on his arm and blood on his hand after the murder, it was reasonable to assume that Mr. Bullcoming's clothes may have provided DNA evidence of the crime. When Mr. Bullcoming went to the Johnsons' home, he brought clothes and his wallet in a trash bag before later picking up his duffel bag at Mr. Standingwater's home. And following Agent Ware's consensual search of the bag—when Mr. Bullcoming asked him to check for his medicine—Agent Ware was aware the duffel bag contained clothing.[3] It was reasonable to assume that the clothes contained in Mr. Bullcoming's duffel bag might have been clothes he wore the night of the murder. While it is not clear

---

[3] Mr. Bullcoming argues that his request to bring the duffel bag with him when he was arrested compels a conclusion that it did not contain inculpatory evidence. We disagree. Although it may have been in Mr. Bullcoming's interest to abandon the bag, his failure to do so does not change the fair probability that trace evidence might be found on his clothing contained in the bag.

15

from the record what happened to the trash bag of clothes Mr. Bullcoming brought to the Johnsons' home, it is reasonable to assume he might have placed those clothes into the duffel bag when he arrived at Mr. Standingwater's home. Alternatively, the clothes he wore to Mr. Standingwater's on the evening of the murder might have been stored in the duffel bag, regardless of what happened to the trash bag's contents. Given the bloody nature of the murder, there was therefore a "fair probability" that a search of Mr. Bullcoming's duffel bag and the clothing inside would reveal DNA evidence helpful to resolving the crime. *Barajas*, 710 F.3d at 1108; *see also United States v. Woody*, 250 F. App'x 867, 876 (10th Cir. 2007) (unpublished) (discussing the bloody nature of a murder and the resulting expectation that forensic evidence should have been found on suspect's clothing and backpack).

Because the affidavit contained "sufficient accurate . . . evidence" to support probable cause even without the information from Agent Ware's challenged searches, the warrant was valid, and the district court was correct to deny Mr. Bullcoming's motion to suppress. *Sims*, 428 F.3d at 954. For these reasons, we affirm the district court's denial of Mr. Bullcoming's motion to suppress.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Mr. Bullcoming's motion to access Ms. Zotigh's trailer and his motion to suppress, and we AFFIRM Mr. Bullcoming's convictions.