NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

DARRELL BRYANT KETCHNER, *Appellant*.

No. 1 CA-CR 22-0458
FILED 5-2-2024

Appeal from the Superior Court in Mohave County
No. S8015CR200900715
The Honorable Rick A. Williams, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Kevin M. Morrow
*Counsel for Appellee*

The Brewer Law Office, Show Low
By Benjamin M. Brewer
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the Court's decision, in which Judge Maria Elena Cruz and Judge Cynthia J. Bailey joined.

**M c M U R D I E**, Judge:

¶1          Darrell Bryant Ketchner appeals from his convictions and sentences for first-degree murder and first-degree burglary. We affirm.

### FACTS[1] AND PROCEDURAL BACKGROUND

¶2          Ketchner and Jackie[2] met in 1997. When they started their relationship, Jackie had two daughters, Abby and Katie, and Ketchner had three daughters. Ketchner and Jackie had three children together over the next ten years.

¶3          In January 2008, Jackie obtained a protective order against Ketchner after he kneed her in the jaw and threatened to slit her throat. Jackie later requested dismissal of the protective order because it was "to[o] difficult with 3 children[.]" The court dismissed the order.

¶4          In January 2009, Jackie obtained another protective order against Ketchner because he threw a milk jug at her and broke Katie's phone. The State charged Ketchner with domestic violence by criminal damage and disorderly conduct. Jackie again requested that the protective order be dismissed so Ketchner could see their children. The court dismissed the order.

¶5          In March 2009, Jackie petitioned for another protective order against Ketchner. In the petition, Jackie claimed that Ketchner threatened to kill her and threw rocks through a car in her driveway. The car belonged to Katie's boyfriend, Nick. The State charged Ketchner with criminal

---

[1]      We view the facts in the light most favorable to sustaining the judgment. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1, n.1 (App. 2019).

[2]      We use pseudonyms to protect the victims' identities.

damage. The court granted the protective order. Ketchner was prohibited from contacting Jackie, Katie, and Abby and could not enter Jackie's house.

¶6    Ketchner threatened to kill the family if the criminal charges filed against him were not dismissed. Additionally, Ketchner "threatened to throw [Nick] in a ditch" if Nick did not dismiss his charge. On July 2, Ketchner approached a police officer to find out about a police report on the criminal charges filed against him. Ketchner said he believed the charges would be dismissed.

¶7    On July 4, 2009, Jackie and the family celebrated her daughter's birthday. Ketchner was not invited. Jackie, Abby, Katie, Nick, and Jackie and Ketchner's two youngest children returned to Jackie's house after watching fireworks. Jackie and Abby sat at the kitchen table, and Katie went into a bedroom with her younger siblings and Nick. A few minutes later, as Nick walked down the hallway, Ketchner entered the house through a side door that led to the kitchen. Ketchner grabbed Jackie by the hair and began striking her. Nick fled the house to get help. After Katie heard her mom and sister screaming, she and her younger siblings escaped the house through a window.

¶8    Eventually, Ketchner and Jackie were in the driveway in front of the house when a neighbor saw Ketchner swinging at Jackie. Jackie was screaming, "[H]e's killing me, he's stabbing me[.]" Ketchner ran into the house, came back outside, walked to where Jackie was on the ground, and shot her in the head. Then, Ketchner disappeared.

¶9    The police and emergency personnel arrived shortly after the neighbors called 9-1-1. They found Abby lying in a pool of blood in a bedroom. Abby suffered multiple stab wounds, including in her chest and back, and she did not survive her injuries. Jackie survived her injuries but does not remember the incident. The next morning, police found Ketchner on a golf course with a gun and a bag containing sex toys, zip ties, clothing, and a chisel.

¶10    A grand jury indicted Ketchner on first-degree murder, attempted first-degree murder, three counts of aggravated assault, first-degree burglary, and misconduct involving weapons. Ketchner pled guilty to the misconduct involving weapons charge and began serving a fifteen-year sentence. A jury convicted Ketchner on the six remaining counts.

¶11    The Arizona Supreme Court reversed Ketchner's first-degree murder and first-degree burglary convictions and sentences and remanded

for a new trial. *State v. Ketchner*, 236 Ariz. 262, 267, ¶ 27 (2014). The court affirmed Ketchner's convictions and sentences for attempted first-degree murder and three counts of aggravated assault. *Id.*

**¶12**      The superior court presided over a second jury trial in 2022 on the first-degree murder and first-degree burglary charges. At the retrial, Ketchner conceded that he killed Abby and shot Jackie. But he claimed that Jackie had invited him over, attacked him, and then he acted in self-defense. The jury rejected the self-defense claim by finding Ketchner guilty on both counts. The superior court sentenced Ketchner to natural life for the murder conviction and a consecutive sentence of 21 years for the burglary conviction. The court ordered the sentences to run consecutively to those the Arizona Supreme Court affirmed. *See Ketchner*, 236 Ariz. at 267, ¶ 27.

**¶13**      Ketchner appealed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1), (2).

## DISCUSSION

**A.      The Superior Court Did Not Abuse Its Discretion by Denying Ketchner's Motions to Inspect the Crime Scene.**

**¶14**      In 2019, Ketchner moved for permission to enter Jackie's house "for the limited purpose of taking measurements of the inside of the residence at the heart of the events in this case." Ketchner asserted that during the first trial, the State presented a house diagram with inaccurate interior dimensions. The superior court denied the motion, finding that Ketchner failed to establish a basis for the inspection. In denying the motion, the court weighed the value of a house inspection almost ten years after the incident against the intrusion to Jackie. The court found that photos and a video walkthrough of the house taken the night of the incident diminished the need for new measurements.

**¶15**      Before the second trial in 2022, Ketchner again moved to inspect the crime scene. The State requested that the court affirm its prior order. Ketchner asserted that the defense team needed to enter the house to gather evidence supporting his self-defense claim. Ketchner wanted to "get a sense of the spatial distances and makeup of the relevant rooms" to impeach Nick's testimony about his sightline from where he stood when he saw Ketchner enter the house and attack Jackie. Ketchner asserted the defense team could minimize the intrusion on Jackie by using a noninvasive laser scanner to generate a three-dimensional image of the house's interior.

¶16 After briefing and argument, the superior court again denied Ketchner's motion to inspect the crime scene and affirmed its prior order. The court found that the inspection would be a significant intrusion for Jackie and that Jackie's objection was reasonable. And the court found that Ketchner failed to prove how denying the motion would prevent him from developing his self-defense claim or challenging witness testimony. The court found that the video walkthrough of the house and the many photographs taken the night of the event were sufficient for Ketchner to raise the self-defense claim and impeach the State's witnesses.

¶17 On appeal, Ketchner argues the superior court denied him his constitutional right to a complete defense by not authorizing the defense team to inspect the property. We review the court's discovery rulings for abuse of discretion. *State v. Garza*, 216 Ariz. 56, 65, ¶ 35 (2007); *Blazek v. Superior Court*, 177 Ariz. 535, 537 (App. 1994) ("A trial court has broad discretion over discovery matters, and this court will not disturb that discretion absent a showing of abuse."). The superior court "abuses its discretion when it misapplies the law or predicates its decision upon irrational bases." *State v. Fields*, 196 Ariz. 580, 582, ¶ 4 (App. 1999) (quoting *Blazek*, 177 Ariz. at 537). We interpret procedural rules and review constitutional questions *de novo. See State ex rel. Thomas v. Newell*, 221 Ariz. 112, 114, ¶ 7 (App. 2009); *R.S. v. Thompson (Vanders II)*, 251 Ariz. 111, 116, ¶ 10 (2021).

¶18 A defendant does not have a "general constitutional right to discovery." *Draper v. Gentry*, 255 Ariz. 417, 422, ¶ 16 (2023) (quoting *Vanders II*, 251 Ariz. at 117, ¶ 16); *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case[.]"). And a crime victim has the right "[t]o be treated with fairness, respect, and dignity" and to refuse a defendant's discovery request. Ariz. Const. art. 2, § 2.1(A)(1), (5). But "the defendant has a due process right, under the federal and Arizona constitutions, to present a defense" and has a "right to effective cross-examination of a witness at trial." *State ex rel. Romley v. Superior Court*, 172 Ariz. 232, 236 (App. 1992). Harmonizing these competing interests presents a mixed question of law and fact that we review *de novo. See State v. Moore*, 222 Ariz. 1, 7, ¶ 17 (2009).

¶19 Ketchner argues that preventing the defense from viewing the crime scene infringed on his due process rights. But the federal due process right to present a complete defense does not guarantee the right to inspect a crime scene. *See, e.g.*, *United States v. Bullcoming*, 22 F.4th 883, 890 (10th Cir. 2022) (The court found no support under the U.S. Constitution that the defendant's due process rights were infringed because he was not allowed

5

access to the victim's property.). Jurisdictions that guarantee crime scene inspections to defendants have done so under their state constitutions. *Id.* at 889; *see also State v. Tetu*, 386 P.3d 844, 857 (Haw. 2016) ("[T]he due process clause of the Hawai'i Constitution provides a defendant with the right to access the crime scene in order to secure the promises that a fair trial affords."). Ketchner does not offer authority suggesting that Arizona's constitution guarantees a defendant the absolute right to inspect a crime scene. And Arizona has not granted defendants broader discovery rights than what is provided by the U.S. Constitution. *See Romley*, 172 Ariz. at 236 (Arizona's due process clause is "congruent" with the federal due process clauses.).

¶20 Generally, a defendant must show that a crime scene inspection is necessary to protect his or her constitutional rights. *See, e.g., Henshaw v. Commonwealth*, 451 S.E.2d 415, 419 (Va. App. 1994) (Virginia's due process clause gives the defendant a right to inspect the crime scene, "provided that the defendant makes a showing that a substantial basis exists for claiming that the proposed inspection and observation will enable the defendant to obtain evidence relevant and material to his defense or to be able to meaningfully defend himself."); *People v. Nicholas*, 599 N.Y.S.2d 779, 782 (Sup. Ct. 1993) ("Unless defense counsel can make a prima facie showing how his proposed inspection and observation would be relevant and material to his defense, the defendant's right to prepare his defense cannot outweigh the victim's constitutional right to privacy."); *Howard v. State*, 156 A.3d 981, 999 (Md. Spec. App. 2017) ("[A]ssuming without deciding that the Due Process Clause guarantees a criminal defendant the right to obtain such evidence before trial, the right nevertheless is predicated on a showing of need."); *but see People ex rel. E.G.*, 368 P.3d 946, 954, ¶ 30 (Colo. 2016) ("[N]either a criminal defendant, nor anyone else . . . has a constitutional right to force a third party to open her private home for an investigation.").

¶21 In Arizona, a court may order parties to make information or material available to the defendant if the court finds that "the defendant has a substantial need for the material or information" to prepare the case and "the defendant cannot obtain the substantial equivalent by other means without undue hardship." Ariz. R. Crim. P. 15.1(g)(1). If the production would infringe on a victim's constitutional rights, the defendant must show that the "substantial need" for the evidence is "one of constitutional dimension." *Vanders II*, 251 Ariz. at 116, ¶ 12 (quoting *State v. Connor*, 215 Ariz. 553, 561, ¶ 22 (App. 2007)). If the defendant makes this showing, the court must balance the defendant's and the victim's rights and interests. *Id.* at 116-17, ¶ 12.

**¶22** Ketchner failed to establish a "substantial need" of "constitutional dimension" to inspect Jackie's home, and the superior court reasonably found that Ketchner had access to substantially equivalent information. *See Vanders II*, 251 Ariz. at 116, ¶ 12; Ariz. R. Crim. P. 15.1(g)(1). The superior court found that Ketchner could present his defense sufficiently with the evidence already available, specifically through the extensive photos and the video walkthrough of the house. The record supports the superior court's findings.

**¶23** Ketchner argues that the superior court failed to identify "how this inspection of the residence would be a significant intrusion on the victim." Considering the nature of the crimes and the heightened privacy protections for one's home, the superior court did not err by finding that a home inspection would infringe on Jackie's victim rights, regardless of the defense's offered concessions to limit the inspection's scope. *See* Ariz. Const. art. 2, § 2.1(A)(1) (A crime victim has the right "[t]o be treated with fairness, respect, and dignity."); *State v. Bolt*, 142 Ariz. 260, 264-65 (1984) (recognizing Arizona's "fundamental belief in the sanctity and privacy of the home").

**¶24** Ketchner argues that "the credibility of witness statements hinge[d] on the accuracy of the diagram of the residence." Ketchner asserts he could not effectively impeach Nick's testimony that he saw Ketchner in the kitchen without accurate house measurements. But Ketchner impeached Nick's testimony by presenting a hallway photo where Nick testified he was standing and past statements Nick made to law enforcement. Because the record contained images showing the hallway leading to the kitchen, the defense did not need house measurements to support the theory that Nick did not see Ketchner enter the house.

**¶25** Ketchner argues that "when a defendant's due process right to present a complete defense (and ultimately, to a fair trial) and a victim's state constitutional or statutory rights directly conflict, the due process right prevails." *Vanders II*, 251 Ariz. at 118, ¶ 20. But there was no conflict here because Ketchner failed to establish that a house inspection was substantially necessary to preserve his constitutional right to a complete defense. *See id.* at 116-17, ¶ 12. Thus, the superior court did not abuse its discretion by precluding Ketchner from inspecting Jackie's house.

**B.**     **The Superior Court Did Not Abuse Its Discretion by Admitting Other Act Evidence.**

¶26        Before Ketchner's first trial, the State moved to admit evidence of the three domestic violence incidents leading to protective orders, Ketchner's threats, and Ketchner's conversation with a police officer about the pending charges that he thought would be dismissed. The State argued the evidence was relevant to establish Ketchner's motive, intent, plan, and absence of mistake and to explain Katie's and Nick's reactions during the July 4 incident. The superior court reviewed the police reports, the protective orders, and interviews with Jackie, Katie, and Nick. The court found that the State proved the domestic violence incidents and threats by clear and convincing evidence. It also found the evidence was relevant to prove Ketchner's motive and intent and explain Katie's and Nick's perceptions and actions during the events. Finally, the court found that the evidence's probative value was not substantially outweighed by unfair prejudice.

¶27        Before the second trial, the State moved to admit the same other acts previously admitted in the first trial: the domestic violence incidents leading to the protective orders, Ketchner's threats, and Ketchner's interaction with the police officer about the charges against him. Ketchner made no specific objection to the evidence but argued generally that the State was admitting the evidence only to prove Ketchner's character and that it was irrelevant to proving who killed Abby or how she was killed.

¶28        The superior court granted the State's motion. It found the evidence was admissible under Arizona Rule of Evidence 404(b). The court determined that the State disclosed the evidence before Ketchner's first trial, which was already "subjected to meaningful adversarial testing" at the trial, and no additional evidentiary hearing was necessary to determine admissibility.

¶29        The court also authorized a limiting instruction. The superior court instructed the jurors only to consider the other acts if they found the State proved them by clear and convincing evidence. The court also instructed the jurors that they could not consider the other acts to determine Ketchner's character and could consider the evidence only "to establish the defendant's motive, opportunity, intent, preparation, plan, knowledge, absence of mistake or accident."

¶30        Ketchner argues that the superior court abused its discretion by admitting the other act evidence because it failed to find that the State

proved the acts by clear and convincing evidence and did not find that the probative value of the acts substantially outweighed any unfair prejudice. We review the court's admission of the evidence for abuse of discretion. *State v. Van Adams*, 194 Ariz. 408, 415, ¶ 20 (1999).

**¶31**      Generally, evidence of other crimes, wrongs, or acts is not admissible to prove someone's character. Ariz. R. Evid. 404(b)(1). But the evidence may be relevant and admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b)(2). Before admitting the evidence, the superior court must find that "(1) the state has proved by clear and convincing evidence that the defendant committed the alleged prior act; (2) the state is offering the evidence for a proper purpose; and (3) its probative value is not outweighed by the potential for unfair prejudice." *State v. Vigil*, 195 Ariz. 189, 191, ¶ 14 (App. 1999). Also, the court must provide a limiting instruction upon a party's request. Ariz. R. Evid. 105.

**¶32**      In the second order, the court found that the evidence was admissible under Arizona Rule of Evidence 404(b). Still, it did not restate its prior findings that the State proved the acts by clear and convincing evidence, the acts were relevant to Ketchner's motive and intent and Katie's and Nick's perceptions, and unfair prejudice did not substantially outweigh the acts' probative value. But the court found that the evidence was already "subjected to meaningful adversarial testing" and reviewed for admissibility at the first trial. *See State v. Morris*, 215 Ariz. 324, 341, ¶ 77 (2007) (When reviewing for abuse of discretion, we will uphold a decision if any reasonable evidence in the record supports it.). When Ketchner opposed the State's evidence, he failed to argue meaningfully that changes in circumstances rendered the evidence previously admitted in the first trial now inadmissible in the second trial. Thus, the superior court did not abuse its discretion by failing to make new 404(b) findings.

**¶33**      Ketchner makes no substantive admissibility challenges other than the superior court's lack of findings under Arizona Rule of Evidence

404(b). Because the superior court made the requisite findings before the first trial, we find no abuse of discretion.[3]

## C. The Superior Court Did Not Abuse Its Discretion by Precluding Other Act Evidence.

¶34 Ketchner moved to admit evidence from Jackie's health history and certain prior interactions with law enforcement. Ketchner anticipated testifying about 14 alleged acts between 2007 and 2009: 1) Jackie persuaded Ketchner's business partners to confront and threaten him; 2) Officers were dispatched to Jackie's home, found her holding a gun, and she later was taken to a mental health facility; 3) Jackie was diagnosed with post-partum depression and taking several prescription medications; 4) Ketchner visited Jackie at the mental health facility, and Jackie was seeking to avoid a schizophrenia diagnosis; 5) Jackie smashed Ketchner's car windows; 6) Jackie called the police on an ex-boyfriend; 7) Jackie attacked Ketchner while he was sick in bed; 8) Jackie reported false information to law enforcement; 9) Jackie responded coldly to Ketchner's health problem; 10) Jackie lost her temper with Katie; 11) Jackie lied to Katie and "set up" the "milk incident" to implicate Ketchner; 12) Jackie's ex-boyfriend left a note on her door; 13) Jackie continued a romantic relationship with her ex-boyfriend despite his prior conviction; 14) Jackie lied to law enforcement about interacting with Ketchner. Ketchner also alleged that Jackie had filed around 20 police reports, but none were about him.

¶35 Ketchner asserted that the evidence supported his mental state on July 4, 2009. He claimed that he knew Jackie had a history of violent behavior and thus reasonably believed he needed to act in self-defense.

---

[3] We acknowledge that the superior court never made 404(b) findings about Ketchner's discussion with the police officer about his pending charges. Before the first trial, the superior court found that the testimony may be admissible, but the State had not presented evidence of the interaction. The court requested that the State make the officer available for testimony so the court could make findings. The State concedes that this did not occur before the officer testified during the first trial but notes that Ketchner failed to object. Ketchner also did not object when the officer testified at the second trial. Ketchner does not challenge the sufficiency of the 404(b) findings from the first trial, but argues the superior court failed to incorporate its ruling from the first trial. Ketchner has thus waived the 404(b) issue about the officer's testimony.

Ketchner also argued the evidence proved Jackie's motive and impeached her character.

¶36        The court precluded testimony about Jackie smashing Ketchner's car windows, finding that the risk of undue prejudice outweighed any probative value or relevance, especially because there was no allegation Jackie was convicted of criminal damage. For similar reasons, the court precluded testimony about officers contacting Jackie after it was reported she had a gun. The court noted that other testimony at trial would reveal that Jackie owned a gun. The court also precluded testimony about Jackie's admission to the mental health facility or Jackie's mental health records because there was no showing she was a danger to herself or others, a post-partum depression diagnosis and prescriptions were not relevant to Ketchner's self-defense claim, and the hospitalization was remote in time as it occurred a year and a half before the incident. Also, because there was no evidence that Jackie had a schizophrenia diagnosis or that Jackie was malingering, Ketchner could not testify about visiting Jackie at the mental health facility based on unfair prejudice. The court noted that Ketchner could testify about his recollection of his relationship with Jackie and "how [Jackie] acted from time to time."

¶37        The court precluded evidence that Jackie called the police on her ex-boyfriend as irrelevant and remote in time but found that Ketchner could testify or ask questions about Jackie's relationship with her ex-boyfriend. The court precluded testimony about Jackie's ex-boyfriend leaving a note on her door because of relevance and authentication issues. The court also precluded evidence that Jackie reported a crime that did not occur as irrelevant and remote in time. The court also precluded testimony that Jackie lost her temper with Katie, as there was no record of the incident, and the court found no relevance "other than to try and paint [Jackie] in very broad brush strokes that she loses her temper." The court also precluded testimony about Jackie filing around 20 police reports, reasoning that Jackie contacting law enforcement was irrelevant to Ketchner's self-defense claim.

¶38        For the allegation that Jackie lied to law enforcement about having contact with Ketchner, the court allowed testimony for a limited purpose. Ketchner could introduce the evidence to establish that Jackie was still in contact with Ketchner despite the protective order. But the defense could not introduce the evidence to establish that Jackie lied to law enforcement because there was no evidence she was prosecuted for a false information charge.

¶39        The court allowed questioning about the allegation that Jackie attacked Ketchner while he was sick in bed. The court also allowed testimony about Jackie responding coldly to Ketchner's health problems. The court allowed "some inquiry" into the milk incident. The court noted there was no evidence that Ketchner's business partners confronted and threatened him, but Ketchner could testify about whether he believed he was being targeted.

¶40        Ketchner argues the superior court erred by precluding some of his proffered evidence. We review the superior court's rulings on the admissibility of evidence for abuse of discretion. *State v. Emery*, 141 Ariz. 549, 551 (1984); *see also State v. Togar*, 248 Ariz. 567, 574, ¶ 23 (App. 2020) (The superior court has broad discretion to balance the probative value of the evidence against its potential for unfair prejudice.).

¶41        Generally, acts of violence are not admissible to prove a victim's violent character because "a victim's character is not an essential element of self-defense." *See State v. Fish*, 222 Ariz. 109, 119, ¶ 29 (App. 2009); *see also* Ariz. R. Evid. 404(b)(1), 405(b). But such evidence may be admissible for other purposes. *See* Ariz. R. Evid. 404(b)(2). If a defendant raises a self-defense claim, the victim's violent acts "may be admissible to show the impact on the defendant's state of mind at the time of the alleged crime and the reasonableness of his actions." *State v. Gentry*, 247 Ariz. 381, 385-86, ¶ 16 (App. 2019). A court may admit such evidence in some cases to show that the defendant knew the victim had a violent disposition, and "this may have affected the defendant's thinking about the need to respond with deadly physical force." *Connor*, 215 Ariz. at 559, ¶ 14.

¶42        Still, the defendant must show that the evidence is relevant and that its probative value is not substantially outweighed by unfair prejudice. *See Gentry*, 247 Ariz. at 386, ¶ 17; Ariz. R. Evid. 401, 402, 403. The court may consider the evidence's strength, the similarity between the prior act and the event at issue, the need for the evidence, whether alternative evidence would be effective, the prior act's timing, and the "the degree to which the evidence would likely engender hostility in the jury." *State v. Zaid*, 249 Ariz. 154, 158, ¶ 13 (App. 2020).

¶43        Ketchner argues that the fact that he knew Jackie accessed her gun, was suspected of smashing his car windows, and had post-partum depression supported his argument that he knew Jackie was "aggressive, violent, and uncontrolled by atypical mental health." He claims that Jackie's excessive filing of police reports supports that Jackie was paranoid, erratic, and experiencing post-partum depression. And the evidence that Jackie

once lost her temper with Katie "demonstrated [Jackie's] ability to become angry at a moment[']s notice, which was known by [Ketchner]."

¶44 The superior court did not abuse its discretion by excluding testimony that Jackie smashed Ketchner's car windows. Even if the testimony supported that Ketchner knew Jackie was violent, the superior court was within its discretion to weigh considerations that the allegation was unsubstantiated and remote in time against the evidence's probative value. *See Zaid*, 249 Ariz. at 158, ¶ 13 (The court may consider the strength of the evidence and the prior act's timing.). Similarly, the court was within its discretion to weigh the fact that there was no report Jackie lost her temper with Katie against the evidence's minimal probative value. *See id.*

¶45 The superior court was also within its discretion to find that Jackie's mental health history was irrelevant to Ketchner's self-defense claim. Ketchner cites *Vanders II* to support his argument that the superior court should have admitted the mental health evidence. In *Vanders II*, our supreme court found there was a reasonable possibility that mental health records stemming from a violent incident and a possible mental health diagnosis were relevant to the defendant's justification defense. 251 Ariz. at 121, ¶¶ 33-35. Thus, the court affirmed the superior court's ruling, ordering an in-camera review of the records. *Id.* at 122, ¶ 38. But the court did not conclude the mental health evidence was relevant to the defendant's justification defense. *See id.* at 121, ¶¶ 34-35. Rather, the court explained that "[u]pon in-camera review, the trial court will determine whether these records" corroborate the defendant's claim the victim was previously violent, whether the victim had a diagnosis supporting her character for violence, and whether the defendant feared for his life. *Id.* at 121, ¶ 35.

¶46 Here, on the other hand, the superior court conducted an in-camera review of Jackie's mental health records and found her mental health history was not relevant to Ketchner's self-defense claim. The superior court reasonably found that Jackie's experiences with post-partum depression, anxiety, or suicidal ideations did not support that she was violent or dangerous. The superior court also had the discretion to consider that Jackie's hospitalization was remote in time. *See Zaid*, 249 Ariz. at 158, ¶ 13. We find no abuse of discretion.

¶47 Nor was Ketchner prejudiced by the exclusion of the mental health evidence because he was allowed to testify about how Jackie acted during their relationship. And the jury heard evidence that Jackie owned a gun and that Ketchner knew she had a gun.

¶48        Ketchner argues that the evidence that Jackie called the police on her ex-boyfriend and that her ex-boyfriend left a note on Jackie's door supported Ketchner's argument that he believed the ex-boyfriend was in the house during the incident and would shoot him. The court did not abuse its discretion by finding that the evidence was irrelevant to Ketchner's self-defense claim. The court also allowed Ketchner to testify and ask questions about Jackie's relationship with her ex-boyfriend. *See Zaid*, 249 Ariz. at 158, ¶ 13 (The court may consider the availability of other evidence.). At trial, Ketchner testified that Jackie's ex-boyfriend was dangerous, he bought Jackie a gun because of her ex-boyfriend, and he knew the ex-boyfriend was recently in town. Any error was harmless. *See id.* at 160, ¶ 22.

¶49        Ketchner also argues that Jackie lied to the police about having contact with Ketchner, explaining how Jackie "would lie to law enforcement to protect [Ketchner]." But Ketchner fails to explain how the evidence was relevant to his claim that he reasonably feared for his life and needed to act in self-defense. *See Gentry*, 247 Ariz. at 385-86, ¶ 16; *Connor*, 215 Ariz. at 559, ¶ 14. The superior court did not abuse its discretion.

**D.        The Superior Court Did Not Abuse Its Discretion by Denying the Motion for a New Trial.**

¶50        After the verdicts, Ketchner moved for a new trial and argued that the superior court erred by 1) allowing the medical examiner to testify about a blood pattern and 2) failing to dismiss a juror. On appeal, Ketchner challenges the denial of the motion.

¶51        We review the superior court's denial of a new trial for abuse of discretion. *State v. Hoskins*, 199 Ariz. 127, 142, ¶ 52 (2000). The superior court may grant a new trial if, among other grounds, the State committed misconduct, a juror committed misconduct, or the defendant did not receive a fair and impartial trial. Ariz. R. Crim. P. 24.1(c)(2), (3), (5).

**1.        The Superior Court Did Not Abuse Its Discretion by Admitting the Medical Examiner's Opinion.**

¶52        At trial, the State called the medical examiner to testify about the autopsy report she created for Abby. The examiner testified she found no defensive wounds on Abby's arms. On cross-examination, defense counsel asked about Abby's hands. He asked whether Abby's palm was red because of blood stains. The examiner confirmed that any blood on Abby's hands would have been washed off for the autopsy.

¶53        On re-direct, the State asked the examiner about photos of Abby's hands taken at the hospital. The State asked whether the blood pattern on Abby's hand was significant. Counsel objected, arguing the testimony was "outside the scope of cross." The court allowed the witness to answer the question but authorized the defense to re-cross the expert if necessary. The medical examiner testified that when she reviewed the blood pattern on Abby's hand, it differed from a "sparing" or "void." She explained that in her line of work, she generally looked for sparing or void patterns to determine whether the decedent was holding a weapon.

¶54        On re-cross, the defense questioned the medical examiner about her blood pattern expertise. The examiner confirmed she was "an expert with the body and what's found on the body." The examiner also explained that she would not have put the opinion about the blood pattern in her report unless she found a void or sparing, a blood pattern consistent with holding a weapon.

¶55        Defense counsel moved to preclude the testimony and requested a mistrial, arguing he was never notified that the medical examiner would testify about the blood pattern on Abby's hand, and the examiner was not qualified to testify on the issue. Counsel argued that he had interviewed the medical examiner twice before the trial, and her opinion about the blood pattern had never come up. But counsel conceded he anticipated another State expert, Lieutenant Meislish, would testify on the issue, and he was "completely prepared to cross-examine him." Counsel also conceded the State notified him it had an expert to refute the defense expert's testimony about the blood pattern on Abby's hand. The court found no basis to strike the testimony and denied the mistrial motion.

¶56        Later, Ketchner called its blood pattern analyst, John Oliveira. Oliveira testified that based on his experiments, it "could not be ruled out" that Abby held a gun during the incident. In rebuttal, the State called Meislish a bloodstain pattern analyst. Meislish disagreed with Oliveira's opinion and found that the blood pattern on Abby's hand was "more consistent with a transfer pattern." Meislish concluded that Abby's "hand came in contact with something that was bloodstained, causing that blood to be transferred onto her hand."

¶57        In the new trial motion, Ketchner argued the State failed to disclose the medical examiner's opinion, and by the time she testified about it at trial, "it was too late to employ the aid of an expert" to investigate the opinion. Ketchner asserted the State's disclosure failure denied him the opportunity to cross-examine the medical examiner on an issue that "went

to the crux of Ketchner's self-defense claims." The superior court denied the motion, finding that the medical examiner's testimony tracked her expertise, and the State did not commit misconduct by presenting the testimony.

¶58　　　　On appeal, Ketchner argues the superior court abused its discretion by denying the new trial motion because the State failed to disclose the medical examiner's opinion, which denied Ketchner a fair trial. The superior court has broad discretion over expert testimony admissions and discovery rulings. *See State v. Alvarado*, 121 Ariz. 485, 488-89 (1979); *State v. Rojas*, 177 Ariz. 454, 459 (App. 1993). And "even if there is a failure to remedy a discovery violation, a subsequent conviction will not be reversed on that account unless the defendant can demonstrate prejudice from the violation." *State v. Tucker*, 157 Ariz. 433, 439 (1988).

¶59　　　　If the State intends to call an expert at trial, it must provide the defendant "the expert's name, address, and qualifications" and "any report prepared by the expert and the results of any completed physical examination, scientific test, experiment, or comparison conducted by the expert." Ariz. R. Crim. P. 15.1(b)(4)(A), (B). If the expert testifies at trial without a written report, the State must provide "a summary of the general subject matter and opinions on which the expert is expected to testify." Ariz. R. Crim. P. 15.1(b)(4)(C).

¶60　　　　Ketchner did not object to the admission of the autopsy report, and he never asserted that the State had failed to disclose it. And the examiner testified that the blood pattern opinion would have only been in her report if she found the presence of a void or sparing. Ketchner interviewed the medical examiner twice and could have asked her about the blood on Abby's hands before her testimony. Thus, the superior court did not abuse its discretion by finding that the State did not have to disclose specifically the expert's opinion on the blood pattern. *See generally* Ariz. R. Crim. P. 15.1(b)(4).

¶61　　　　The record also supports that the examiner's blood-pattern opinion was within her expertise. *See* Ariz. R. Evid. 702. As a forensic pathologist, the examiner testified that she had significant training and experience identifying blood patterns on decedents' bodies. And it was routine for her to look for void or sparing patterns during autopsies. The superior court did not abuse its discretion by finding no misconduct and that the testimony was admissible.

¶62　　　　Nor was Ketchner prejudiced by the admission. *See Tucker*, 157 Ariz. at 439. We reject Ketchner's argument that allowing the testimony deprived him of a fair trial because he could not effectively cross-examine the medical examiner on the issue. Counsel conceded he interviewed the medical examiner twice before trial, he was aware the State had an expert to refute the defense expert's blood pattern opinion, and he was prepared to cross-examine Meislish on the same issue. We find no abuse of discretion.

### 2. The Superior Court Did Not Abuse Its Discretion by Allowing Juror 14 to Serve.

¶63　　　　During the trial, one of Ketchner's daughters recognized Juror 14. The court questioned Juror 14 and asked whether he knew Ketchner's daughter. Juror 14 responded that the daughter was an "acquaintance-type" "[y]ears ago," "[m]aybe through school." He asserted that nothing about his contact with the daughter would cause him to favor one side, and he could still be fair and impartial. Neither the State nor Ketchner questioned the juror. The court noted that the prospective jurors were not asked whether they knew this daughter because she was not on the list of potential witnesses.

¶64　　　　Ketchner moved to strike Juror 14. Counsel explained he did not "know how this person who went [to] school with one of the daughters doesn't know about the case," and he was concerned that the juror was "not giving [them] the whole story." The superior court denied the motion.

¶65　　　　In the new trial motion, Ketchner argued that Juror 14 was dishonest and biased in reaching the verdicts. Ketchner attached a sworn declaration from an investigator who interviewed the daughter. The investigator declared that the daughter stated she was friends with Juror 14's late wife, the daughter and Juror 14 were friends on social media, Juror 14 knew Ketchner's family, and Juror 14 attended a social event hosted by the daughter about eight years before trial. Ketchner asserted that Juror 14 concealed that he knew Ketchner "despite being asked to disclose that information at the start of the trial."

¶66　　　　The superior court denied the motion, finding no evidence that Juror 14 was dishonest. It found that nothing in the declaration suggested that Juror 14 knew Ketchner, knew about the case, or was lying. And Juror 14's statement that he knew the daughter "years ago" aligned with the declaration. Finally, there was no "indication that Juror 14 was lying or that he somehow knew Mr. Ketchner and was hiding that fact."

**¶67**         Ketchner argues the superior court abused its discretion by refusing to strike the juror and denying the new trial motion because Juror 14 was untruthful, and the juror's bias denied Ketchner his right to a fair and impartial jury. We review the "court's refusal to strike a juror for abuse of discretion." *State v. Acuna Valenzuela*, 245 Ariz. 197, 209, ¶ 21 (2018).

**¶68**         When assessing whether a juror is fair and impartial, the superior court is in the best position to assess the juror's demeanor. *See Acuna Valenzuela*, 245 Ariz. at 209, ¶ 24. Thus, we "defer to the trial judge's perceptions of the juror and question only whether the judge's findings are supported by the record." *State v. Allen*, 253 Ariz. 306, 331, ¶ 47 (2022).

**¶69**         Ketchner urges this court to presume bias because Juror 14 did not previously inform the court about his past contact with Ketchner's daughter. But as the superior court pointed out, Juror 14 was not asked about the daughter during voir dire because she was not on the witness list. The superior court reasonably found that none of the evidence in the new trial motion suggested that Juror 14 knew Ketchner. Ketchner challenges Juror 14's credibility, arguing, "[i]t would be difficult to imagine that a juror who knew the Ketchner family at the time of the incident in 2009 did not know anything about the criminal proceedings." But the superior court was within its discretion to find that Juror 14 was telling the truth during voir dire. *See Allen*, 253 Ariz. at 331, ¶ 47.

**¶70**         Nor will we presume that Juror 14 could not render a fair and impartial verdict because he was acquainted with Ketchner's daughter years ago. *See Acuna Valenzuela*, 245 Ariz. at 210, ¶ 32 ("[A] juror who knows some of the people involved in a case is not automatically barred from serving on a jury."). The juror attested he could be fair and impartial, and the court believed him. The superior court was within its discretion to find that Juror 14 could be fair and impartial despite his past contact with Ketchner's daughter. *See Allen*, 253 Ariz. at 331, ¶ 47.

**¶71**         Because the record supports the superior court's findings that Juror 14 was truthful and impartial, it did not abuse its discretion by denying the motion to strike Juror 14 and the new trial motion.

**E.      Ketchner Fails to Establish that the Superior Court Committed Misconduct Requiring Reversal.**

**¶72**         During sentencing, the superior court referenced Ketchner's trial statements. The court commented on a claim Ketchner made and said, "And when I heard that . . . . I thought to myself what a rotten thing to say by just an absolutely rotten human being." Before the court announced

Ketchner's sentence, it said, "And it's time to send Mr. Ketchner back to his cage I guess." Ketchner did not object or raise the issue in his post-trial motions. On appeal, Ketchner argues that the court's statements during sentencing "demonstrate[] clear bias against [him]" that requires reversal and a new trial.

¶73        The right to a fair trial includes the right "to have the trial presided over by a judge who is completely impartial and free of bias or prejudice." *State v. Hill*, 174 Ariz. 313, 322 (1993). "A party challenging a trial judge's impartiality must overcome a strong presumption that trial judges are 'free of bias and prejudice.'" *State v. Cropper*, 205 Ariz. 181, 185, ¶ 22 (2003) (quoting *State v. Medina*, 193 Ariz. 504, 510, ¶ 11 (1999)). To overcome this burden, the party asserting bias must "set forth a specific basis for the claim of partiality" and prove by a preponderance of the evidence that the judge has "a hostile feeling or spirit of ill-will, or undue friendship or favoritism, towards one of the litigants." *Id.* (quoting *Medina*, 193 Ariz. at 510, ¶ 11, and *In re Guardianship of Styer*, 24 Ariz. App. 148, 151 (1975)).

¶74        Ketchner lists court rulings that he claims show the court's "feelings for Ketchner during the entire case." Ketchner points to instances he raised in his 2017 motion for a change of judge. For example, during the first trial, he claims the court "allowed a plethora of other act evidence to be admitted" and "permitted the State to present blind expert testimony regarding profiling of domestic violence victims and abusers." *See Ketchner*, 236 Ariz. at 265, 266-67, ¶¶ 19, 25 (reversing first-degree murder and burglary convictions because of inadmissible profile evidence). But "[j]udicial rulings alone do not support a finding of bias or partiality without a showing of an extrajudicial source of bias or deep-seated favoritism." *State v. Macias*, 249 Ariz. 335, 342, ¶ 22 (App. 2020); *see also Hill*, 174 Ariz. at 324 (An erroneous ruling does not necessarily show a judge's bias toward a litigant.).

¶75        Ketchner also cites court rulings on motions to appoint new counsel in 2015 and 2016. Ketchner claims that when handling the counsel issues, the court did not acknowledge his *pro se ex parte* motions, failed to ask about conflicts, and admonished Ketchner "that he needed to get along with counsel." Ketchner asserts the court should "consider these additional factors as support for the argument that these statements at sentencing were something other than a mistake or slip of the tongue."

¶76        But Ketchner did not claim that the court's rulings amounted to reversible error on appeal. *See State v. Curry*, 187 Ariz. 623, 631 (App.

1996) ("[W]e fail to understand how adverse rulings to which a party assigns no error can nevertheless amount to bias."). Ketchner fails to explain how the judge displayed "deep-seated and unequivocal antagonism." *See Liteky v. United States*, 510 U.S. 540, 556 (1994). Ketchner fails to overcome the strong presumption that the court was unbiased.

**F.      We Lack Jurisdiction to Review the Superior Court's Denial of Ketchner's Motion to Vacate the Judgment.**

¶77      After appealing his convictions and sentences, Ketchner moved to vacate the first-degree murder conviction and sentence based on newly discovered material facts.[4] *See* Ariz. R. Crim. P. ("Rule") 24.2(a)(2). Ketchner attached statements from the defense investigator that detailed his post-trial interviews with jurors and listed what the jurors had told him about the jury deliberations. Ketchner alleged the jurors were confused about the verdict forms, and two jurors did not recall discussing the felony-murder verdict. Ketchner asserted the verdict forms did not represent the jury's true verdict. This court stayed the appeal pending the superior court's ruling on the motion.

¶78      The superior court denied the motion. It found that the trial evidence, specifically the jury instructions, juror questions and answers, and the verdict forms, "establish[ed] that the jury was not confused." The jury unanimously found Ketchner guilty of first-degree felony murder, and the jury also found Ketchner guilty of the lesser-included offense of second-degree murder from the State's premeditation theory. Ketchner was lawfully sentenced for first-degree felony murder, and the court found no error. Ketchner did not file another notice of appeal from the denial of the motion.

¶79      Ketchner challenges the superior court's denial of his motion to vacate the judgment. The State asserts this court lacks jurisdiction to review the judgment because Ketchner did not separately appeal it. We agree.

¶80      "[A] ruling on a Rule 24.2 motion is a separately appealable order." *State v. Wynn*, 114 Ariz. 561, 563 (App. 1977). Ketchner had to file a notice of appeal "no later than 20 days after entry of the decision." Ariz. R.

---

4      Ketchner moved for a new trial in the alternative, but the motion was not timely because it was filed two months after the jury verdicts. *See* Ariz. R. Crim. P. 24.1(b).

Crim. P. 24.2(d). Because Ketchner did not appeal the court's order, we lack jurisdiction to review it. *See Wynn*, 114 Ariz. at 563.

**¶82**        Though the case addressed a different rule, we acknowledge that the Arizona Supreme Court recently vacated a decision holding that a defendant had "to separately appeal the denial of his motion for new trial." *State v. Sanchez*, CR 23-0270-PR, 2024 WL 938080, at *1 (Ariz. Mar. 5, 2024). The court reasoned that when "a defendant timely files a notice of appeal from the 'judgment of guilt and sentence,' that notice logically endows the court of appeals with jurisdiction to address all *pre-judgment* rulings or orders necessarily affecting that judgment." *Id.* (Emphasis added.) But unlike a motion for a new trial, which must be filed no later than ten days after the verdict, *see* Ariz. R. Crim. P. 24.1(b), a Rule 24.2 motion is always a *post*-judgment motion. *See* Ariz. R. Crim. P. 24.2(b); *see also State v. Hickle*, 129 Ariz. 330, 332 (1981) (The Rule 24.2 motion filed before judgment and sentencing was premature.). Thus, we see no reason to depart from *State v. Wynn*. *See* 114 Ariz. at 563.

**¶82**        Ketchner argues that he did not waive his right to appeal the ruling on the motion because the superior court did not inform him of the right. Rule 26.11(a) and (b) require the court to inform the defendant of the right to appeal the judgment and sentence. The superior court provided Ketchner with written notice of his right to appeal after sentencing, which he signed. This notice advised Ketchner in part:

> If you want to appeal from a judgment of conviction and imposition of sentence, you must file a Notice of Appeal (Form 24(a)) within 20 days after the court's oral pronouncement of your sentence in the courtroom. *If you want to appeal from any other appealable judgment or order, you must file a Notice of Appeal (Form 24(a)) no later than 20 days after the entry of the judgment or order.* You will lose your right to appeal if you do not file a Notice of Appeal within the time required.

(Emphasis added.) If Ketchner believes his counsel was ineffective by failing to appeal the ruling on the motion, he may petition for post-conviction relief. *See* Ariz. R. Crim. P. 32.1(a); *State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9 (2002).

## CONCLUSION

¶83        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA